IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| BOARD OF TRUSTEES, | ) | |
| SHEET METAL WORKERS' | ) | |
| NATIONAL PENSION FUND | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 06cv44 |
| | ) | |
| COURTAD CONSTRUCTION | ) | |
| SYSTEMS, INC. | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

This is an ERISA[1] dispute between an employer and a plan trustee over whether the employer is obligated to continue to make contributions to the plan given its claim that the qualifying installation work is now done by subcontractors, not by its workers. The plan trustee disputes whether the qualifying work is being accomplished by the employer's workers and contends that this dispute must be submitted to arbitration and that the employer must make interim payments pending the outcome of the arbitration.

At issue on summary judgment, therefore, are the following questions:

1. Should the dispute over whether the employer's workers have resumed doing the qualifying installation work be submitted to arbitration or decided on this summary judgment record?

2. Is the employer required to make interim payments to the plan pending the outcome of the arbitration or litigation?

---

[1]Employee Retirement Income Security Act, 29 U.S.C. §§ 1001 *et seq.*,

**I.**[2]

Plaintiff, the Board of Trustees of the Sheet Metal Worker's National Pension Fund (the Board), is a fiduciary with respect to a jointly administered multiemployer pension plan (the Plan) under ERISA, 29 U.S.C. § 1002(37). Defendant, Courtad Construction Systems, Inc. (Courtad), was a signatory to a collective bargaining agreement (CBA) with Local Union No. 33 (Local 33) of the Sheet Metal Workers' International Association.

From May 1999 until April 2004, Courtad made pension contribution payments to the Plan on behalf of its sheet metal field installation employees in accordance with the CBA. Courtad ceased making contribution payments to the Plan at the end of April 2004 when the CBA expired. Thereafter, in June 2004, the Board determined that Courtad employees had continued or resumed performing the qualifying sheet metal installation work after the CBA expired. This, in the Board's view, meant that Courtad had effected a "complete withdrawal" as defined in § 4203 of MPPAA,[3] 29 U.S.C. § 1383(b)[4] thereby triggering Courtad's obligation to

---

[2]The facts recited here are derived from the parties' pleadings, moving papers, and supporting affidavits, with conflicts either noted as immaterial to the disposition of the motion at bar, or resolved in favor of defendant as the non-movant. *See Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 255 (1986); *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 364 (4th Cir. 1985).

[3]The Multiemployer Pension Plan Amendment Act (MPPAA), 29 U.S.C. §§ 1381 *et seq.*, is an amendment to ERISA enacted in 1980 to specifically address the financial hardship imposed when employers withdraw from pensions plans, thereby leaving those plans with unfunded vested benefits. *See Concrete Pipe and Products of California, Inc. v. Construction Laborers Pension Trust for Southern California,* 508 U.S. 602, 608 (1993).

"Withdrawal" as used in the MPPAA means that an employer has ceased making payments to a multiemployer pension plan. In some situations, the employer's exit from the plan will not create any legal obligations, but generally an employer will incur some liability to the plan as a result of its withdrawal. A "notice of withdrawal" is issued by the plan to inform the employer that although the employer has ceased its participation in the multiemployer pension plan, the employer must make "withdrawal liability" payments to the plan to cover the

resume making payments to the Plan. Under the MPPAA, an employer withdrawing from a multiemployer pension plan incurs what is termed "withdrawal liability" in the form of a fixed and certain debt to the pension plan. *Concrete Pipe and Products of California, Inc. v. Construction Laborers Pension Trust for Southern California,* 508 U.S. 602, 609 (1993).[5] Courtad responded to the Board in August 2004, explaining that it had not participated in any sheet metal installation projects since the expiration of the CBA, and thus the Board had no basis for issuing the withdrawal assessment. At this point in time, the Board accepted Courtad's contention that it had not generated any revenue from sheet metal installation projects since

---

employer's share of the plan's unfunded accrued benefits. For employers in the building and construction industry the notice of withdrawal is not triggered solely by the cessation of the employer's obligation to contribute to the plan, but rather by the employer's resumption of the type of work for which contributions to the plan were previously required. *See* 29 U.S.C. § 1383(b). 3 Lee T. Polk, *ERISA Practice & Litigation* § 12:7 ( 2005).

[4]29 U.S.C. § 1383(b) is applicable specifically to withdrawal in the building and construction industry, and provides as follows:

> (1) a complete withdrawal occurs only as described in paragraph (2) if
>     (A) substantially all the employees with respect to whom the employer has an obligation to contribute under the plan perform work in the building and construction industry and
>     (B) the plan primarily covers employees in the building and construction industry.
> (2) A withdrawal occurs under this paragraph if:
>     (A) the employer ceases to have an obligation to contribute under the plan, and
>     (B) the employer
>         (I) continues to perform work in the jurisdiction of the collective bargaining agreement of the type for which contributions were previously required, or
>         (ii) resumes such work within 5 years after the date on which the obligation to contribute under the plan ceases.

[5]This debt should reflect the employer's proportionate share of the plan's unfunded vested benefits (calculated as the difference between the present value of vested benefits and the current value of the plan's assets). *See Pension Benefit Guaranty Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 725 (1984).

February 2004. Accordingly the Board agreed in October 2004 to rescind the withdrawal liability assessment.

Yet, the matter did not end here. A few months later business representatives for Local 33 began to receive reports and other information from their members that Courtad had resumed the type of sheet metal field installation work covered by the CBA, thereby arguably triggering the MPPAA requirement to make pension contributions. Local 33 informed the Board of these reports and provided the Board with verifying documentation. Acting on this information, the Board, on July 7, 2005, notified Courtad that it had reassessed Courtad's withdrawal liability, and concluded that Courtad had completely withdrawn from the Plan and thus owed the Plan withdrawal liability of $141,580.54, payable in quarterly installments of $11,044.17. Yet again, Courtad disputed the Board's withdrawal liability assessment. This time, however, Courtad did not deny that it was involved in sheet metal installation projects, but contended that it had no obligation to resume payments to the Plan because all the installation work was performed not by Courtad, but by Courtad's subcontractors. In support of this view, Courtad notes that the CBA did not require contributions to the Board for the work of subcontractors and therefore, because Courtad has not resumed work for which contributions were previously required under the CBA, no withdrawal has occurred.

Courtad notified the Board of its disagreement with the withdrawal assessment in a timely manner, and on November 21, 2005, requested arbitration to resolve the dispute pursuant to 29 U.S.C. § 1401(a). Although it complied with the MPPAA's requirement to provide notice and seek arbitration of the issues, Courtad has not complied with the MPPAA requirement under 29 U.S.C. § 1399(c)(2) to make interim withdrawal liability payments while arbitration is pending.

4

Accordingly, the Board filed this suit to compel interim payment.  Pursuant to a scheduling order, the parties proceeded to complete discovery on the issues presented by the Board's complaint. The Board, taking the view that the obligation to make interim payments is a question of law, has filed a motion for summary judgment, whereas Courtad believes that the underlying complete withdrawal assessment dispute can be resolved judicially on the basis of the summary judgment record.  Now ripe for disposition on motion for summary judgment are, first, the question whether the dispute should be resolved on the basis of the summary judgment record without requiring arbitration, and second, assuming arbitration is required, whether Courtad must make withdrawal liability payments pending the outcome of arbitration.

II.

Analysis of the arbitration question properly begins with the MPPAA's provisions governing arbitration.  To begin with, the MPPAA provides that where a plan sponsor, here the Board, determines that an employer has withdrawn, it must ascertain the prescribed amount of the employer's withdrawal liability and the prescribed payment schedule.  29 U.S.C. §§ 1382, 1399(b)(1).  The specific withdrawal liability calculations are made pursuant to 29 U.S.C. § 1391.  Once the plan sponsor has made the withdrawal assessment, it must notify the employer and demand payment.  If the employer objects after the notice and the parties cannot resolve the dispute on their own, the MPPAA requires that, "any dispute between an employer and plan sponsor of a multiemployer plan concerning a determination made under sections 1381 to 1399 of this title *shall be resolved through arbitration*."  29 U.S.C. § 1401(a) (emphasis added). Arbitration, therefore, is statutorily mandated where, as here, the parties dispute a complete

withdrawal assessment.[6]

Yet, this does not end the analysis as Courtad argues that district courts may resolve MPPAA disputes of this nature without resorting to arbitration where, as Courtad claims is true here, the factual record is fully developed and no material facts remain disputed. All that remains, in Courtad's view, is a question of contract interpretation, namely whether, under the CBA, a complete withdrawal occurs when an employer resumes or continues performing the qualifying work through the use of subcontractors.

This argument is factually and legally infirm. To begin, the current record is not complete with respect to the Board's factual support for the withdrawal assessment. This is so because the issue raised in this suit is not the propriety of the Board's withdrawal determination, as this issue must be arbitrated, but only whether interim payments are required, pending the outcome of arbitration. Thus, the Board is under no obligation here to submit all of its evidence to support the withdrawal assessment because that matter must be arbitrated and because the sole remedy sought in this suit is a judgment on the question of interim payments. The Board correctly viewed this suit as limited to the interim payments requirement with the propriety of its complete withdrawal determination to be resolved in the arbitration. This view finds support in *Concrete Pipe and Products of California, Inc. v. Construction Laborers Pension Trust for Southern California,* 508 U.S. 602, 609 (1993), where the Supreme Court ruled that the plan

---

[6]Arbitration is the preferred means of dispute resolution both because of the arbitrator's specialized knowledge with respect to multiemployer plans and the speed and economy of the arbitration process. *See I.A.M. Nat'l Pension Fund v. Clinton Engines Corp.*, 825 F.2d 415 (D.C. Cir. 1987) (recognizing Congress' intent "to bring about expeditious resolutions" and avoid "unnecessarily cumbersome and costly" litigation with the MPPAA's compulsory arbitration requirement).

sponsor is not obligated to conduct an exhaustive factual investigation prior to the arbitration proceeding. As the Supreme Court put it, withdrawal determination is "an assessment not an adjudication." *Id.* The Supreme Court went on to emphasize that:

> The [plan sponsors] are not required to hold a hearing, to examine witnesses, or to adjudicate the disputes of contending parties on matters of fact or law. . . [T]he first adjudication is the proceeding that occurs before the arbitrator, not the trustees' initial determination of liability.

*Id.*

In sum, then, the current record in this case, contrary to Courtad's contention, is neither factually complete on the merits of the Board's complete withdrawal determination, nor should it be so, given that this suit focuses not on the propriety of that determination, but on whether Courtad has a mandatory duty to make interim payments pending completion of the arbitration. To hold otherwise would allow parties to make an end run around the MPPAA's arbitration requirement.

Courtad's argument also lacks legal support. Although there is no circuit authority directly on point, there is authority that points persuasively to the conclusion that this matter must be submitted to arbitration. First, the Fourth Circuit has held that while the MPPAA's compulsory arbitration requirement is not a jurisdictional bar, it should be enforced except in exceptional circumstances, none of which exists here. *See McDonald v. Centra, Inc.*, 946 F.2d 1059, 1063 (4th Cir. 1991) (holding that the MPPAA statute requires arbitration absent exceptional circumstances). Specifically, the Fourth Circuit has recognized exceptions to MPPAA-required arbitration only, "where an employer makes a facial constitutional attack or shows that irreparable injury will result from being forced to make interim payments."

*Teamsters Joint Council No. 83 v. Centra, Inc.*, 947 F.2d 115, 12- (4th Cir. 1991) (citing *McDonald v. Centra*, 118 B.R. 903, 922 (D.Md. 1990); *Flying Tiger Line v. Teamsters Pension Trust Fund of Philadelphia*, 830 F.2d 1241, 1249 (3d Cir. 1987)). Importantly, questions of statutory interpretation alone are insufficient to warrant bypassing the arbitration requirement. *McDonald*, 946 F.2d at 1064.[7] Even the limited statutory interpretation exception recognized in the D.C. Circuit applies only where, as is not here the case, a defendant has raised a legitimate legal question of statutory interpretation that must be resolved in order to ascertain whether the statutory scheme even applies to the defendant. *Centra*, 947 F.2d at 122 (citing *I.A.M. National Pension Fund v. Clinton Engines Corp.*, 825 F.2d 415, 417 (D.C.Cir. 1987). In general, courts have applied this exception only in cases where the employer claimed it was not an employer for MPPAA purposes in time to acquire withdrawal liability (i.e. prior to the date the MPPAA arbitration provisions went into effect) or where the employer asserts that it was never an MPPAA employer and thus is not subject to the MPPAA's dispute resolution procedures. *Id.* (citing *Flying Tiger Line*, 830 F.2d at 1250-51; *Banner Industries v. Central States Pension Fund*, 875 F.2d 1285, 1291 (7th Cir. 1989)).

None of these judicially recognized exceptions to the MPPAA arbitration requirement are applicable here. Courtad does not assert a facial constitutional challenge, nor has it alleged that arbitration would cause irreparable harm; instead its argument to avoid arbitration focuses on the statutory interpretation exception. In short, Courtad contends that given the summary judgment

---

[7]*McDonald* quotes *I.A.M. National Pension Fund v. Clinton Engines Corp.*, 825 F.2d 415, 418 (D.C. Cir. 1987) which limits the reach of the statutory exception to those situations where, "neither party timely presses the arbitration requirement, and the court finds that deferring a court contest while the parties repair to arbitration will neither lead to the application of superior expertise nor promote judicial economy."

record, the only dispute with respect to withdrawal is whether Courtad's liability is triggered by the use of a subcontractor to do the sheet metal installation work. According to Courtad this determination is purely statutory, and thus the matter can be easily and promptly decided on summary judgment here without resort to arbitration.

Courtad's effort to invoke the statutory interpretation exception to mandatory MPPAA arbitration fails. Courtad does not dispute that it is an employer as defined under the MPPAA. Nor does Courtad question whether the MPPAA provisions govern resolution of the parties' dispute. In fact, Courtad's argument does not require interpretation of the MPPAA statute at all; it involves instead an interpretation of the terms of the parties' CBA. Specifically, Courtad contends that the CBA did not require contributions for subcontracted employees. The question of what types of work trigger withdrawal liability is a determination which can and should be made by an arbitrator and does not present a question of statutory interpretation which must be decided, in the first instance, by a district court.

In summary, as the MPPAA's plain language and existing authority make pellucidly clear, the parties must submit to arbitration their dispute over the correctness of the Board's complete withdrawal assessment. While there are exceptions to the MPPAA's mandatory arbitration requirement, none apply here.

### III.

Given that the parties must proceed to arbitration for resolution of the underlying withdrawal liability dispute, the next question presented is whether Courtad should be compelled to make interim payments while arbitration is pending. Here again, the MPPAA's plain language provides the answer. The applicable MPPAA section states, in part, as follows:

> [Withdrawal liability] Payments shall be made by an employer in accordance with the determinations made under this part until the arbitrator issues a final decision with respect to the determination submitted for arbitration, with any necessary adjustments in subsequent payments for overpayments or underpayments arising out of the decision of the arbitrator with respect to the determination.

29 U.S.C. 1401(d). Additionally, the MPPAA states that:

> withdrawal liability shall be payable in accordance with the schedule set forth by the plan sponsor under subsection (b)(1) beginning no later than 60 days after the date of the demand notwithstanding any request for review or appeal of determination of the amount of such liability. . .

29 U.S.C. § 1399(c)(2).

This unequivocal statutory language mandates interim withdrawal payments pending arbitration and the Fourth Circuit[8] and many other circuits have recognized that district courts are empowered to order employers to make such payments.[9] Absent this power, the MPPAA's interim payment requirement would be rendered ineffectual and Congress' purpose in enacting the MPPAA would be significantly undermined.[10] Importantly, the Fourth Circuit, in *Centra*, declined to recognize any exceptions to the interim payment requirement, emphasizing that

---

[8]*See Centra*, 947 F.2d at 119.

[9]*See, e.g., Debreceni v. Merchants Terminal Corp.*, 889 F.2d 1, 5 (1st Cir. 1989); *Robbins v. Pepsi-Cola Metropolitan Bottling Co.*, 800 F.2d 641 (7th Cir. 1986); *Marvin Hayes Lines, Inc. v. Central States, Southeast & Southwest Areas Pension Fund*, 814 F.2d 297, 299 (6th Cir. 1987); *United Retail & Wholesale Employees Teamsters Union Local No. 115 Pension Plan v. Yahn & McDonnell, Inc.*, 787 F.2d 128, 134 (3d Cir. 1986); *Trustees of Amalgamated Ins. Fund v. Geltman Indus. Inc.*, 784 F.2d 926, 931 (9th Cir. 1986); *Trustees of the Retirement Fund of the Fur Manufacturing Industry v. Lazar-Wisotzky, Inc.*, 738 F.2d 419 (2d Cir. 1984).

[10]As the cases reflect, notably *Pension Benefit Guaranty Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 721 (1984), Congress enacted the MPPAA to eliminate incentives for withdrawal and to strengthen multiemployer plans so that employees and their beneficiaries would not be deprived of anticipated retirement benefits. *Id.* at 720, 722-23. Congress believed that the viability of these plans should not be put unnecessarily at risk by subjecting them to lengthy litigation delays in their ability to collect withdrawal payments.

MPPAA, "unambiguously established a 'pay now, dispute later' dispute resolution procedure designed to protect the financial stability of multi-employer pension plans from unnecessary risk caused by protracted delay in the collection of withdrawal liability payments." 947 F.2d at 119. Further, the court acknowledged that other circuits had allowed an equitable exception to the, "pay now, dispute later" scheme established under the MPPAA, but declined to rule on the matter because it was uneccessary for resolution of that specific dispute. *Id.* at 120.[11] In any event, it is clear that even assuming the Fourth Circuit were to accept equitable exceptions to the MPPAA's "pay now, dispute later" scheme, no such exceptions apply here.

The equitable exception rule, as adopted by the Fifth and Seventh Circuits, gives district courts discretion to decline to compel interim payments in extreme situations. This narrow exception was first recognized in *Robbins v. McNicholas Transportation Co.*, 819 F.2d 682 (7th Cir. 1987), where the Seventh Circuit held that, "the [district] court should consider the probability of the employer's success in defeating liability before the arbitrator and the impact of the demanded interim payments on the employer and his business." *Id.* at 685. In *Robbins,* the employer had produced financial statements demonstrating that its annual income barely exceeded the required monthly payments for withdrawal liability. Given this showing, the Seventh Circuit remanded the case for the district court to determine the employer's probability of success before the arbitrator and the gravity of economic hardship the employer would suffer if compelled to make interim payments. *Id*. at 686.

---

[11]In *Centra*, the dispute was whether a corporation that purchased reorganized stock from a withdrawing employer was required to pay interim withdrawal liability. The corporation did raise any equitable defenses.

Subsequent courts have applied this exception as a two part test: (1) has the employer made an affirmative showing that the pension fund lacks a colorable claim, and (2) would the employer suffer irreparable harm if compelled to make interim payments. *See Trustees of the Chicago Truck Drivers, Helpers and Warehouse Workers Union Pension Fund v. Rentar Indus., Inc.*, 951 F.2d 152, 155 (7th Cir. 1991). *See also Trustees of the Plumbers and Pipefitters National Pension Fund v. Mar-Len, Inc.*, 30 F.3d 621 (5th Cir. 1994). When applying the test, if the employer cannot establish that the plan sponsor's claim is frivolous, a district court should not proceed to the question of irreparable harm. *Id.*[12]  Furthermore, even the courts recognizing the equitable exception are clear that it is, "not an invitation to pre-try the case or to excuse payments by those employers whose precarious financial condition creates the greatest risk to the pension plan." *Trustees of the Chicago Truck Drivers, Helpers & Warehouse Workers Union Pension Fund v. Central Trans., Inc.*, 935 F.2d 114, 119 (7th Cir. 1991); *Mar-Len*, 20 F.3d at 625-26. Rather a court need only, "assure itself that the plan's claim is legitimate, . . . [then] order the making of interim payments and leave the rest to the arbitrator." *Rentar*, 951 F.2d at 155.

From these cases, it is clear that even in circuits that recognize the equitable exception rule, the employer must satisfy a very high standard to trigger the exception. In the present case, it is equally clear that Courtad has not met this standard with respect to either part of the test for

---

[12]The exception has been discussed in *dicta* from the First, Third, and Sixth Circuits. *See Debreceni*, 889 F.2d at 6 (holding that, "if any equitable exception exists, it would be limited to certain very specific circumstances that are entirely absent here."); *Galgay v. Beaverbrook Coal Co.*, 105 F.3d 137 (3d. Cir 1997) ("agreeing with the reasoning employed by Fifth and Seventh Circuits in concluding that a showing of irreparable harm to the employer is alone insufficient to warrant equitable relief."); *Marvin Hayes Lines, Inc.*, 814 F.2d 297, 300 (6th Cir. 1987).

application of the equitable exception. First, there is no persuasive showing that the Board's claim for withdrawal liability is frivolous, or that Courtad would suffer irreparable harm if compelled to make interim payments. The Board has at least a colorable claim for withdrawal liability based on the reports submitted by Local Union representatives that indicated Courtad had resumed sheet metal installation work. Courtad's efforts to undermine the credibility of the Board's witnesses and reports are insufficient to prove that the Board's claim is entirely frivolous.

Further, Courtad fails to satisfy the irreparable harm requirement. Courts recognizing the equitable exception apply a very high standard for finding irreparable harm. And, the analysis must also take into account the fact that pending the arbitration decision, adjustments for over and underpayment will be made and the employer will be reimbursed for any payments incorrectly assessed. *See* 29 U.S.C. § 1401(d); *See also Central States Southeast and Southwest Areas Pension Fund v. Matlack Systems, Inc.*, 1998 U.S. Dist. LEXIS 17904.(N.D.Ill. 1998). Only the threat of imminent solvency is sufficient to demonstrate irreparable harm. *See Debreceni*, 889 F.2d at 7 (noting that any lesser degree of injury could not be classified as irreparable). In this regard, the Fourth Circuit in *Centra* cited two district court cases to demonstrate the high standard for irreparable harm. In the first case an employer was required to show that making interim payments would force it to cease operations, *Centra*, 947 F.2d at 120 (citing *Connors v. Brady-Cline Coal Co.*, 668 F.Supp. 5, 8 (D.D.C. 1987)), and in the second case the employer had to demonstrate that interim payments would lead to bankruptcy or the brink of financial ruin. *Id.* (citing *Robbins v. Pepsi-Cola Metropolitan Bottling Co.*, 637 F.Supp.

1014, 1018 (N.D. Ill. 1986)).[13]

Courtad neither alleges nor shows that making interim payments would have such a harsh impact on its financial health; at most it alleges only a general economic hardship. Notably, Courtad offers no evidence to support even this less drastic allegation. From this record, therefore, there is no basis to find the irreparable harm required to invoke the equitable exception to the MPPAA's mandatory interim payment requirement. Because Courtad's reliance on the equitable exception rule fails on both elements, the Board is entitled to the issuance of an injunction requiring Courtad to make the assessed interim withdrawal payments pending the outcome of the arbitration.

### IV.

The MPPAA not only mandates that withdrawing employers make interim payments pending arbitration, it also provides that where plan sponsors are required to litigate to compel such payments and succeed in doing so, they are entitled to an award of liquidated damages, interest, and reasonable attorneys' fees and costs. Specifically, the same section of the MPPAA creating the cause of action to compel employers to make interim payments also states that, "any failure of the employer to make any withdrawal liability payment within the time prescribed shall be treated in the same manner as a delinquent contribution (within the meaning of section 1145 of this title)." 29 U.S.C. § 1451(b). A "delinquent employer," in turn, is liable not only for delinquent contributions but also for interest on unpaid contributions, liquidated damages as provided for under the pension plan agreement, amd reasonable attorneys' fees and costs in the

---

[13]This, of course, is *dicta* because this Fourth Circuit panel never adopted the equitable exception.

event a multiemployer Board is required to file suit to recover contributions owed it.[14] *See McDonald v. Centra, Inc.*, 946 F.2d 1059, 1065 (4th Cir. 1991). Specifically, under ERISA §§ 502(g)(2)(B), (C), the plan, if it prevails in a suit to compel withdrawal payments must be awarded the greater of (I) double interest or (ii) interest and liquidated damages as provided for under the plan, provided the liquidated damages do not exceed twenty percent of the amount of unpaid contributions. The award of interest, damages and attorneys' fees is mandatory.[15] Because, as determined in this suit, Courtad was required to make withdrawal liability payments and failed to do so, they are delinquent under the MPPAA. The plain language of the statute thereby dictates that in addition to the obligation to make withdrawal liability payments, Courtad is liable for liquidated damages, interest and attorneys' fees and costs.

---

[14]ERISA Section 502(g)(2) provides:
> In any action under this title by a fiduciary for or on behalf of a plan to enforce section 1145 in which a judgment in favor of the plan is awarded, the court shall award the plan
> (A) unpaid contributions
> (B) interest paid on the unpaid contributions
> (C) am amount equal to the greater of:
> > (I) interest on unpaid contributions: or
> > (ii) liquidated damages provided for under the plan in an amount not in excess of 20 percent of the amount determined by the court in sub-paragraph (A),
> (D) reasonable attorney's fees and costs of the action, to be paid by the defendant, and
> (E) such other legal or equitable relief as the court deems appropriate.

For the purposes of this paragraph, interest on unpaid contributions shall be determined by using the rate provided under the plan. 29 U.S.C. § 1132(g)(2).

[15]*See Trustees of Amalgamated Ins. Fund v. Sheldon Hall Clothing, Inc.*, 862 F.2d 1020, 1023-24 (3d Cir. 1988) ("award of these amounts . . . is mandatory for the district court, not discretionary"); *Carriers Container Council, Inc. v. Mobile S.S. Assn-International Longshoreman's Assoc., etc.*, 896 F.2d 1330, 1346 (11th Cir. 1990) ("under the statute the district court *must* award the Plan the unpaid withdrawal payments, double interest on those contributions [or interest and liquidated damages] and attorneys' fees) (emphasis added).

Here, the Plan agreement, which Courtad was a party to under the CBA, contains provisions that a delinquent employer must pay interest on delinquent payments at a rate of 8.5% per annum and liquidated damages in an amount equal to the greater of the interest or twenty (20) percent of the delinquent payments.  The Board has calculated the interest on Courtad's unpaid contributions to be $1,633.07 and liquidated damages in the amount of $8,035.34 (which is exactly 20% of the unpaid contributions to date, $40,176.68).  The Board's calculations in this regard are not disputed by Courtad.  Thus, in addition to making interim withdrawal payments, Courtad must pay the interest, liquidated damages and reasonable attorneys' fees.

An appropriate order will issue.


_____/s/_____

Alexandria, Virginia                              T. S. Ellis III
July 18, 2006                                     United States District Judge